Domenico E. Fazzio v. Commissioner. Josephine Fazio Fazzio v. Commissioner.
Fazzio v. Commissioner
Docket Nos. 111857, 112564.
United States Tax Court
1943 Tax Ct. Memo LEXIS 126; 2 T.C.M. (CCH) 737; T.C.M. (RIA) 43410; September 7, 1943
*126 Robert A. Ainsworth, Jr., Esq., 2208 American Bank Bldg., New Orleans, La., for the petitioners. J. L. Backstrom, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in the income tax of each of the petitioners for the year 1939 in the sum of $425.34. That part of the deficiencies is here in issue which resulted from respondent's disallowance of deductions claimed by petitioners on account of "pin, claw and music tags" in the total amount of $7,603, which petitioners contend constituted deductible business expenses. Findings of Fact Domenico E. Fazzio and his wife, Josephine Fazio Fazzio, are residents of New Orleans, La., and filed income tax returns on the community property basis for the year 1939 with the collector of internal revenue for the district of Louisiana. The term "petitioner" will be used hereinafter for convenience to refer to Domenico E. Fazzio alone. Petitioner owned and was in the business of operating under profit-sharing arrangements with the owners of various restaurants, bars and places of amusement in the City of New Orleans, certain pinball, iron claw and automatic music machines. The payments *127 which have been determined by the Commissioner not to constitute ordinary and necessary expenses of petitioner's business were payments to three so-called associations known respectively as the "New Orleans Coin Vending Machine Association," "Merchandise Vending Association," and "United Music Machine Operators Association," which will be referred to herein as the pinball, iron claw, and music machine "associations," respectively. The payments made by petitioner in 1939 to the respective associations and for which he received certain "tags" to be affixed to his machines as evidence that he was a member in good standing, were as follows: Pinball association
$5,751.00
Iron claw association
1,350.50
Music machine association
502.00
Total
$7,603.50
Sometime in 1937 petitioner received information from the owner of a place in which he had some of his pinball machines that his machine "had to be closed up." At the same time he was advised by another owner of pinball machines that in order to operate he "had to go to see" one Julius Pace. The operation of pinball machines was not illegal. Petitioner went to see Pace and was advised that he "had to have tags on his machines" *128 at a charge of $2 per month for each machine at that time. Pace also told petitioner that he should join the pinball association of which Pace was the president. Petitioner joined the association and made the payments required every month. Pace told the members at a meeting that if these association "dues" were not paid their machines would be picked up and destroyed. In 1939 the payments required were $8 per month per machine. Petitioner estimated that there were about 50 members of the association operating in the City of New Orleans. Petitioner does not know what was done with the money collected by the association, and he never asked an accounting from the association as to what was done with the money. The Association employed an attorney or some other agent to lobby before the legislature with respect to some bill which was pending to raise the cost of licenses or permits. State, City and parish license certificates were not paid for the operators by the association. The benefit which petitioner says he received from the association was that it kept other people from trying to get locations in which petitioner had already installed machines. In the fall of 1938 a meeting of *129 the operators of the iron claw machines was called in the office of one George Brennan in which it was proposed to organize an association "for the mutual benefit of the operators." Petitioner objected that such an association would be of no benefit to him. Shortly after this meeting members of the association caused a number of incidents to be reported to petitioner from which petitioner concluded that pressure was being put on him by the police to join the iron claw association. The operation of iron claw machines was not illegal. The payments, required by such association were $4 per machine per month. The iron claw association in 1939 collected $34,052.50 which was reported on its income tax return to have been disbursed as "Commissions paid to G. A. Brennan as administrator and agent for association." Brennan was president of the association. Petitioner does not know what actually became of the money collected by the association, except that he knew that the association employed an attorney with whom he once consulted "about something." The primary purpose of the organization and source of benefit to petitioner from his membership therein was the restraint of competition among *130 members. The by-laws of the iron claw association are incorporated herein by reference; their general character appears from the following excerpts: All matters of dispute or settlement of controversial questions shall be decided by G. A. Brennan. A list of locations for each member must be filed weekly, every Monday. * * *
1. Only one Operator will be allowed to operate in each location at any one time. * * *
6. No member will be allowed to solicit or obtain any other member's location, providing such member is in good standing. * * *
1. This amendment shall be considered as amplifying Article 6 of the By-Laws: Each machine in a location not bearing a current tag will make that location open to any other operator who is able to place his machine in said location, and to cause the present operator to remove such box not bearing current tag. Membership identification tags will be ready for delivery on call the first day of each month. Midnight of the fifth day of each month is expiration time for attachment of membership identification tags of the current month's issue. Tags should be placed in each machine so as to be readily seen for easy identification. This amendment *131 is issued January 16, 1939. You are given five days from the present day to attach January's tags to each machine registered. 2. This amendment is to prohibit the solicitation of business where a vending machine of a member of this Association, in good standing, is in service. * * *
Where it is definitely proven that one member has unfairly attacked the business of another member by solicitation, the offending member shall be penalized the loss of two locations. The same to be chosen by the aggrieved member. In a circular letter dated January 28, 1939, which is appended to these by-laws, Brennan suggested to the membership, "From my personal viewpoint, I can not see why an operator of automatic vending machines would have any business in a location where he does not have a vending machine discussing any matter pertaining to vending machines." Petitioner was also a member of the Music Machine Association of which George Brennan was also president. Petitioner made payments to this association in 1939 at the rate of $2 per machine per month. This association collected $20,566 in 1939, which was reported on its income tax return to have been disbursed as "Commissions paid to G. *132 A. Brennan as administrator and agent for association." Petitioner does not know what actually became of the money collected except that he knew that the association had some attorneys representing it. The primary purpose of the organization and source of benefit arising from petitioner's membership therein was the suppression of competition. The By-laws of the Music Machine Association are incorporated herein by reference; their general character appears from the following excerpts: All matters of dispute or settlement or controversial questions shall be decided by the President. Failure to comply with decision rendered by the President shall automatically suspend offending member, and locations of suspended member shall be listed to all other members as open for solicitation. * * *
A list of locations for each member must be filed each month with order for Identification Tags. * * *
6. A new owner of location (new business) is entitled to have in his establishment any Automatic Phonograph he desires. * * *
8. No location owner is entitled to change machines unless operator fails to give fair service and supply fairly good records. 9. No member of this Association is *133 allowed to sell an Automatic Phonograph regardless of age except to members of this Association. * * *
10. A machine in a location not bearing a current tag would make that location open to any other operator who is able to place his machine in said location, and deprive the present operator of the business therein. * * *
(January 14, 1938) 17. Effective this date all operators must register each new location through this Office. * * *
(December 27, 1939) 19. Effective this date no member of this Association shall place or service Automatic Phonographs in blacklisted locations on rental basis. * * *
In a circular letter dated January 17, 1938, appended to these by-lays the reason for Rule 9 quoted above is explained as being to prevent establishments in New Orleans from acquiring obsolete or discarded Automatic Phonographs, since: * * * These machines, no matter how old, would establish ownership of machine by the proprietor of a business, and could be operated for a very short while by the proprietor as his own machine. As soon as the proprietor desired, he could discard same after displacing a member, and contract with a new operator giving his reason for a change *134 of operator as discarding his own Automatic Phonograph. The pinball association had by-laws along the same lines and covering the same matters as those of the Music Machine Association referred to above. Opinion KERN, Judge: The associations in question to which petitioner made the payments deducted during the taxable year from gross income may have been organized for the purpose of exacting tribute for the benefit of "racketeers" preying upon the fears and credulities of persons like the petitioner who were engaged in a business some phases of which were barely within the law; or for the purpose of "lobbying" before the State Legislature in opposition to legislation which might have outlawed the activities engaged in by members of some of the associations, or increasing the prices to be paid for licenses upon the use of the various machines owned by members of the Associations. If these were the objects of the associations, then dues paid to them would not be deductible. See , . However, after a careful consideration *135 of the evidence herein we have concluded that the primary reason for petitioner's membership in the associations here in question, and the payment by him of sums sought to be deducted, was to eliminate competition in the various business enterprises which he carried on and that the primary purpose of the associations from the standpoint of their members was the restraint of trade by the prevention of competition. Such a purpose is contrary to public policy as stated in the Federal statutes and the law of the State of Louisiana. See , wherein the Court says: "All combination and arrangements which have for their purpose the unlawful stifling or restriction of competition, or which may probably have that effect, or necessarily have that tendency, are against public policy and unlawful." Although the expenditures may have been "ordinary" in the sense that they were not unusual, they can not be considered "necessary" "since the law will not recognize the necessity of engaging in illegal courses in the conduct of a business." See . *136 We see no difference in principle between contributions or dues paid for the purpose of effecting an illegal combination in restraint of trade and expenditures made afterwards in the unsuccessful defense of a criminal prosecution resulting from such a combination. In both cases public policy requires a holding that the expenditure in question is not a necessary expense of conducting business and is not deductible as an expense. Decision will be entered for respondent.